And and we'll move on to our next case Allgood v. St. Croix County Allgood v. St. Croix County, Wisconsin Okay, I think, is Mr. Melms going to be online here on the video? Okay, Mr. Melms, can you hear us okay? Yes, Your Honor, I can. Okay, we're all set, so you can begin whenever you're ready. Thank you, Your Honor. My client, Mr. Allgood, was 61 years old when he was arrested by six younger and larger officers with the assistance of a police canine. These officers tackled him to the ground and sicked the police canine on him, leaving it on him for nearly a minute, causing pretty substantial injuries. I think the... Hold on for a second. I see Judge Rover speaking, but I can't hear her. Judge Rover, can you hear us? Perfectly. Okay, now I can hear you. Were you asking a question? I was trying to. Okay, go ahead. Thank you. Do you concede at this point that we're only dealing with the claim against Deputy Monge? For excessive force, I think we'd only be dealing with the claim against Deputy Monge. I think they're viable failure to intervene claims against the other officers, though. Mr. Melms, I have a question for you, you know, based on the video. What rule would you like us to announce in this case as to, you know, your client was, I mean, belligerent and actively resisting, and the police officer, he's not going to go into custody easily. Then he reached for a taser. This was a little bit of a brawl in the front yard, and then the dog is holding onto the leg, and the officers, as immediately upon handcuffing of your client, the dog releases your client's grip on the leg. What should we tell officers in the field as to when they need to allow the dog or to take the dog off the leg? At what moment? I think the clearest bright line that could be drawn here, and I don't think the dog was ever really necessary because it was six at one. Well, that's not your call, though. That's the police officer's call. Nonetheless, once someone is fully restrained by six officers, I don't think continuing to use force through the dog is constitutionally permissible. I agree with that. I would agree with that. Was he fully restrained before he was handcuffed? Because he continued to resist until he was placed in the handcuffs, and as soon as he was fully restrained, immediately the dog released its grip on your client's leg. I think from the video it becomes pretty clear that he is no longer capable of getting away, causing injury to the officers, once you've got six of these guys on top of him. I mean, he's about 120 pounds. But you see, that's an impossible line to draw, because is the sixth officer excessive? Is the fifth officer excessive? Is the fourth officer excessive? We've consistently said once he's restrained. Here, restrained means put in handcuffs, and then everything ends, because now he can't continue to fight. But before those handcuffs are on, man, he fought. He fought like a fish out of water. I think at the point that every one of his limbs and his chest are pinned to the ground by officers, he's restrained, and that dog was certainly at that point stopped being necessary, and it became excessive. Not to release the dog at the point that each of his limbs was pinned to the ground. Even though he was within reach of Feyerweather's taser? Once he's pinned, he was not in reach of Feyerweather's taser. I think that was really only the first fuse, the initial portion of the, I guess, the scuffle on the ground. I think he's also very clearly not trying to take it away from him, but get it out of his face. In that video, he's pushing it away. He's not trying to take it away. He's protecting himself, not endangering the officers. Do you think we can take into consideration Mr. Allgood's history with threatening police officers? I don't think he was convicted of any of that. I mean, it ultimately wound up being untrue. He was tried by a jury of his peers and found not guilty for making the threats. So, I mean, I don't think that should be taken into consideration, certainly in any substantial way. I mean, it's obviously information the law enforcement officers knew going in, but it was incorrect information. So I guess it has to be dealt with in that manner. Thank you. Would you like to save the rest of your time for rebuttal? Yes, certainly. I would save the rest of my time for rebuttal.  Ms. Mills. Thank you, Your Honor. If you may please the court. This is the somewhat rare case where video evidence truly does evaporate any material factual questions. We have five different angles showing exactly what happened from each officer's perspective. Hold on there, counsel. So I think the videos, I think I disagree with my colleagues that the videos are that clear. Okay, so I see someone grilling on their deck, listening to Phil Collins. And I see a lot of officers approach. It is true, Mr. Allgood was not compliant. But right before the dog is put on him, you know, I see him coming out of his garage, walking toward the only vehicle that's around, unless I think he was going to escape in his RV. But he wasn't walking, he wasn't running. And I heard him say, let's go, let's go, which could be interpreted as surrender. And at that point, you have Officer Fairweather, and then the dog, and then it just automatically escalates, right? So aren't there some disputed issues of fact here? Not at all. Okay. I don't think that it escalates at that moment whatsoever. We have to look at the totality of the circumstances. When you look at the entire event from start to finish, and I'm going to focus on Mangene, because he's really the only one whose arguments were developed about the claim against Mangene. So I'll stick with him. He gets a call, he's told, we need you to report to this residence for felony warrant for threats to a law enforcement officer. So already he knows this is somebody who's not necessarily going to be friendly with law enforcement. But in addition to that, in that 11-mile drive, he's hearing the radio traffic of the first group of officers who get there, and he knows this guy's not being compliant. But he's also receiving information directly from the sheriff about this gentleman's past history, which included threats towards law enforcement officers, and specifically to stab a police canine in past interactions. So there's that entire background information that when Mangene arrives and sees this gentleman continuing not to resist, and then hears him making statements such as, shoot, shoot first, and then retreating into his home multiple times and locking the door, which law enforcement is trained to know that that is going to present a potential threat because he can grab anything he wants in there. Adding to that, he doesn't tell officers where he's going, what he's doing. They're confused. Half of them go to the back of the residence. The other half start going to the front. That's when Mangene... He's also going in and out of his house. As the officers are trying to effectuate arrest, he knows there's a warrant for his arrest. The officers aren't there selling cookies. Right. And so when he goes into his house, I mean, as you see him coming in and out of the door, there would be no reason if he was truly surrendering for him to go back in his house. His door's right there. But let's fast forward to the moment of him coming out of the garage. You know, he says he was surrendering. Some of the videos support that view, right? I think the dog... It does happen very quickly, right? Are officers expected to adjust to the circumstances once they get on the scene? Absolutely. And so Mangene, where was he exactly when Allgood came out of the garage? Mangene was still sort of in the... And if you're familiar with the video, hopefully my description is sufficient. But he's coming around the house so that if he's looking, he could maybe see part of the driveway, but he cannot see the garage door opening. He's hearing Fairweather yell, stop, step down. I didn't hear stop. I heard step down, which, frankly, I'm not sure what that means. Sure. Where does that come from? Is there anything in the record about that? I think he said at some point he was just saying something to effectuate this man to stop. I don't know. I think it's very reasonable to assume if you've got an officer with a taser drawn at you and saying step down, that means stop. I don't know how else a subject would interpret that. If anything, maybe step down, meaning get on the ground. He did neither. What about the last 20 seconds before Deputy Mangin ordered Ash to release Mr. Allgood? He says he was fully immobilized at that point and there was no need for the dog to continue to bite. That is directly rebutted by the record. And it is clearly shown. We cited to the specific portion of the video. One of the body cam videos, it is at the record 40-11 at minute 137. You can see that Mr. Allgood is on page 26 of our brief. But this is from Deputy Mangin's body camera. Mr. Allgood is actively running when the dog reaches him. And that was at the exact same moment that Deputy Fairweather was attempting to decentralize him. Because what Mangin saw as he rounded that corner was Allgood about one to two feet away from Fairweather. Fairweather's got his taser drawn, but it's now ineffective distance. And it looks as if, because Mr. Allgood is raising his hand, it looks as if he's either trying to push that away, the taser away, or grab that taser. That's key to me, because isn't that a disputed issue of fact? One can interpret that and say, he was walking. He said, let's go. I'm going to surrender. Don't put that taser in my face. Couldn't a jury believe that versus I'm going to grab the taser? I don't see any grabbing of the taser on the video. So I think you're overstating what the video shows. I think that regardless of what Mr. Allgood is saying, we have to look at it from the perspective of the officer. And what the officer said he saw and what he perceived in this highly chaotic situation is what we need to focus on. Not what Mr. Allgood said, well, my actual intent was X, Y, or Z. That doesn't matter. It would be if somebody was on the ground struggling with officers as they're trying to handcuff him, as this instance. And by the way, one thing we're overlooking is what in the world would be the clearly established law that says the officers can't do what they did here, other than to say you can't use excessive force, period? Which is as general as it can be. I don't think the plaintiff has pointed to any case that's even remotely analogous to what happened here to say there's clearly established law that Manjean could not have done what he did here, other than to say you can't use excessive force. Right. We looked through, you know, we went through in great detail the Alessia, hopefully I'm saying that correctly, and Becker cases. They're totally, they're nothing like, I mean, we've got one guy in a swimming pool that's got his hands on his head, surrounded, there's nothing even remotely analogous to those cases, to the facts here. They're easily factually distinguishable. There's no case that suggests that an officer in Manjean's position would be unreasonable to perceive what Mr. Allgood was doing as a threat that required him to take action. There's no case that suggests that the level of force that Mr. or Deputy Manjean took by releasing a canine was unreasonable. And particularly when you have that whole context of this guy's history, what he's there for, 20 minutes of arguing, saying things like shoot first. But Manjean also knew that there were no violent convictions, correct? These were charges that had been brought against Mr. Allgood, charges, and you presumed innocent in our country, right? He knew, I read this specifically in his deposition, at the time when he got to the arrest site, that Manjean had no violent convictions. Is that correct? Right, and you can take that entire... I mean, let's see, someone commits a violent crime for the first time every time, right? I mean, just because someone doesn't have a violent conviction doesn't mean they're non-violent. And really, again, you have to go back to the entire situation. He knew that there wasn't a conviction for a violent felony, but he also knew that every time law enforcement interacted with Mr. Allgood, which was a lot, Mr. Allgood was violent. There were times when he brandished knives. This is about noise complaints, right? Which I would argue simply shows how volatile Mr. Allgood is. If law enforcement is showing up and talking to you about a noise complaint, and you're immediately going from one to 100 miles an hour and threatening to stab canines, that, to me... I think he was trying to protect his pets in defense of Mr. Allgood. Right, because he said he had small pets and they were there to arrest his son, and he overreacted clearly. I'll take that. But in this instance, again, there is absolutely no case law that would make any of the deputies, but particularly Deputy Mangine as a canine deputy, even remotely question when he sees somebody who has something in his hand, he doesn't know what it is, one to two feet away from a deputy trying to do something with that deputy's taser, and 20 minutes preceding that have been argumentative, potentially saying things about shooting people. There's nothing that would have put him on notice that releasing the canine at that moment was in any way excessive or unconstitutional, unreasonable under any rubric. And I see I've run out of time. Actually, I have a question just following up on that. So at some point, does this change, though, during the... Let's say that it was reasonable to use the dog for the reasons you say. Does that change at some point when the four limbs are pinned on the ground? Looking at the video, I see a lot of grimacing, which for me could be pain, from the dog bite. Why is it reasonable to keep the dog on the leg and actually turn him, which must have damaged the leg further, onto his stomach? It's reasonable to keep the dog on until the subject is fully subdued. Now, I know that my colleague... Isn't there a dispute about that, though? No. I mean, the same could be said about handcuffs. Why put him in handcuffs if he's subdued? Right. Right? I mean, why put him in the police car if he's subdued? Let him walk. When all law enforcement officers, and this is in the record, but when law enforcement officers are trained that if they have the ability to yank a hand out from someone's grasp, especially in a situation like this, there's two issues that they have to keep aware of. One, all of their duty vests are right over this guy's grabbing area. All of the dangerous things on those vests are within this man's reach. The number two important thing when you're dealing with a canine is if he gets limbs loose and then everybody else goes and is trying to grab, that dog's going to bite on something, whether it's your hand, his hand, whose leg is that. So the most cautious but also safest for everyone is to ensure that this gentleman is fully subdued with handcuffs before releasing the dog. And then the minute that he is fully subdued and he can't reach again towards the taser, which he'd already reached for twice, and law enforcement reasonably perceived that that is what he was doing, that's when you release the dog. Now, if Mangene had waited five seconds, 10 seconds, 15 seconds after those handcuffs were on, then I think we would definitely be talking about a different story. But in this case, that's not what happened. He immediately said, okay, I'm releasing the dog. He told Mr. Allgood multiple times when Allgood was on the ground, stop resisting. I'm going to release the dog once you've stopped resisting and you're subdued. And that's exactly what happened. All right, thank you, Miss Mills. Okay, Mr. Mills, maybe you want to discuss the clearly established law here and tell us what case you can point to that isn't even remotely analogous to this one that would have told Officer Mangene that what he did here was in violation of the United States Constitution. I mean, I think the most clearly established law, and ultimately we're looking at this in the light most favorable to the non-moving party, which is my client, is that using force on a subdued suspect is excessive force. That's far too broad. We've said that repeatedly. That is far too broad. Certainly. So, but more than that, if we look to Becker and Alicia, I think we see a closely analogous case. Which of those two was the one where the guy was in the empty swimming pool with his hands on his head surrendering? Was that Becker or was that Alicia? I can't remember. I believe that was Alicia and Becker was using a police dog on a subdued suspect. But I could certainly be flipping those two in my head. Yeah, Alicia. Here's what we said in Alicia. The defendant officer ordered his canine partner to attack a burglary suspect who was standing still, arms raised, inside an empty above-ground pool surrounded by five-foot walls and who had immediately complied with police officers or police orders. And you think that's analogous to what happened here? Did you watch the videos? I certainly watched the video, Your Honor. And I think in the light most favorable to my client, when you see him walking out of the garage, his hands are exposed. He provided in his deposition the explanation that he said that I am surrendering my phone in my hand. That is unclear in the video. But what is not unclear is when he says, let's go and starts walking to the police car. I think in the light most favorable to him, that is him surrendering. And at that point, using that police dog became excessive force under Alicia. And I think even further than that, continuing to use the dog. Did the video look like he's surrendering when he was on the ground fighting with the officers, reaching for the taser? Is that how you interpreted the video? I mean, we can't defy common sense. I mean, we take the facts in light most favorable to your client. But we don't defy common sense. And what you're saying is that a reasonable juror could find that once he was on the ground, he was no longer resisting. He wasn't struggling or fighting with the officers? I mean, I think a good point was made earlier that a lot of that was grimacing. You have a dog with its teeth buried into his calf. He was in an excruciating amount of pain. I don't think that that was necessarily active resistance so much as it was response to the pain. But even once he – but even not – if we don't consider that and we only consider what – sort of when he became subdued. I mean, I think in the light most favorable to him, he was subdued well before he was in handcuffs when there was an officer on every one of his limbs. That's my question. What case can you point to that says the officer has to release the bite on the dog before – here's clearly what happened. The officer released the bite of the dog when the defendant was put in handcuffs. What case can you say that he has to release the bite on the dog before he's put in handcuffs? And you point to Becker and Elyse and Becker. The plaintiff surrendered. He was descending the stairs with hands on his head and a dog bit him for multiple minutes. Sure. I think when we look – and the reason that Becker is still analogous is that when we look into the case law, there's not a lot of difference between being subdued and having surrendered for the – when we talk about use of force. There's a big difference. You're saying there's no difference between someone surrendering to police versus fighting with them and being subdued? Because, I mean, we have cases where we say, look, if a police officer punches someone three or four times and it's excessive because he punched him the fourth time, we say, no, we don't substitute our judgment for that of the police officer in that moment. We don't do that. Well, that's certainly true. Once a suspect is fully subdued, their use of force against them is certainly unconstitutional. So while the fourth punch may not be the problem in that, if we get to the 20th punch, then we certainly do reach a point where there's a problem. I think Ms. Mills would agree with you because she said this case would be different if your client had been handcuffed and the dog maintained his grip on his leg for 30 seconds. We have a different case. That's not what happened here. I don't necessarily believe, though, that the handcuffs are the trigger there. I think that once he's subdued, that's the trigger. He was subdued well before he was in handcuffs. And certainly in the light most favorable to him, he was subdued well before he was in handcuffs. All right, Mr. Mills. Thank you. Thank you very much. We've got your argument. Thank you, Your Honor. Okay, the case will be taken under advisement.